RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

GUSTAV BUCHHOLZ,

*Plaintiff-Appellant*,

v.

MEYER NJUS TANICK, PA,

*Defendant-Appellee*.

> No. 18-2261

―――――――――――

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-00607—Gordon J. Quist, District Judge.

Argued:  June 20, 2019

Decided and Filed:  January 3, 2020

Before:  COOK, NALBANDIAN, and MURPHY, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:**  Philip D. Stern, STERN THOMASSON LLP, Springfield, New Jersey, for Appellant.  Kathleen H. Klaus, MADDIN HAUSER ROTH & HELLER, Southfield, Michigan, for Appellee.  **ON BRIEF:**  Philip D. Stern, Andrew T. Thomasson, Francis R. Greene, STERN THOMASSON LLP, Springfield, New Jersey, for Appellant.  Kathleen H. Klaus, MADDIN HAUSER ROTH & HELLER, Southfield, Michigan, for Appellee.

 NALBANDIAN, J., delivered the opinion of the court in which COOK, J., joined, and MURPHY, J., joined in part.  MURPHY, J. (pp. 19–25), delivered a separate opinion concurring in part and in the judgment.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.   Gustav Buchholz received two letters from law firm Meyer Njus Tanick, PA ("MNT") about two debts he owed to Synchrony Bank.  The letters, which appeared on MNT letterhead and were signed by an MNT attorney, informed Buchholz that MNT was acting as a debt collector and provided contact information for him to either challenge or pay the debts.  Buchholz does not dispute the debts, but he alleges that the letters made him feel anxious and fear that MNT would sue him if he did not promptly pay.

So Buchholz sued MNT.  Buchholz alleges that MNT violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, by giving the impression that an attorney had reviewed his case and determined that he owed the debts.  Buchholz alleges that MNT processes so many debt collection letters each day that no MNT attorney could possibly engage in a meaningful review of individual claims.

But Buchholz's case fails before we can even consider its merits.  Because Buchholz has shown no injury in fact that is traceable to MNT's challenged conduct, he lacks standing to sue, and we lack jurisdiction to hear his case.  We affirm the district court's dismissal of Buchholz's complaint.

I.

Buchholz, a Michigan resident, received two letters in May 2018 about overdue payments he owed on two accounts with Synchrony Bank.[1]  The letters came from MNT, a Minneapolis-based law firm, and appeared on MNT's letterhead.  As Buchholz explains in his complaint, each letter referred to a specific account, but the content is identical and "formulaic in nature," save for the "information regarding the specific account the letter was referencing."  (R. 12, First Am. Compl. at ¶¶ 14–15.)  MNT attorney Kara Harms signed both letters, but Buchholz alleges that

---

[1]One account was for a Walmart credit card.  The other account was for a Sam's Club personal credit account.

because the signatures are identical, MNT must have inserted "some sort of pre-populated or stock signature." (*Id.* at ¶ 17–18.)

Although MNT is a law firm, the letters do not threaten legal action. Indeed, the letters purport to be "communication[s] [ ] from a debt collector" and explain that MNT "has been retained to collect the above-referenced debt[s]." (*See, e.g.*, R. 14-2, Letter.) Still, Buchholz alleges that after he received the letters, he "felt an undue sense of anxiety that he would be subjected to legal action if prompt payment was not made." (R. 12, First Am. Compl. at ¶ 32.) Because of that anxiety, Buchholz "conferred with his counsel" about MNT's letters. (*Id.* at ¶ 33.) And then Buchholz sued MNT.

Buchholz alleges that MNT violated the FDCPA—specifically, 15 U.S.C. § 1692e, e(3), and e(10). His claim relies on a series of inferences, including that Synchrony Bank "clearly works with [MNT] on a regular basis" and that Synchrony Bank has a "proportionally large number of accounts that are subjected to collection activities." (*Id.* at ¶ 23, 22.) Buchholz asks the court to infer that because MNT works with Synchrony, MNT must send "a large number of collection letters to consumers on a daily basis." (*Id.* at ¶ 23.) And Buchholz alleges that because Kara Harms (whose signature appears on the two letters he received) is MNT's only Michigan-based attorney, "it is unlikely" she devoted "much time to Plaintiff's accounts, let alone the additional letters she sends out on a daily basis." (*Id.* at ¶ 29.) Indeed, Buchholz claims that MNT processes such a high volume of debt-collection letters that Harms and other MNT attorneys cannot engage "in a meaningful review of the underlying accounts prior to determining whether to send the collection letters." (*Id.* at ¶ 30). But the letters, which appear on law firm letterhead, create the impression that the attorney "has reviewed the file and made the professional, considered determination to send the letter." (*Id.* at ¶ 41.) And this, according to Buchholz, violates the FDCPA.

MNT moved to dismiss Buchholz's complaint for lack of subject-matter jurisdiction and for failing to state a claim. The district court granted MNT's motion, holding that Buchholz lacked standing to sue MNT. Alternatively, the court held that even if it had subject-matter jurisdiction, it would have dismissed Buchholz's complaint for failing to state a claim. Buchholz appeals the dismissal of his complaint.

II.

This court reviews de novo a district court's dismissal of a complaint for lack of subject-matter jurisdiction. *See, e.g.*, *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014). In doing so, we take the allegations in the complaint as true. *Id.* at 759.

A.

Not all disputes have a home in federal court. Article III limits the judicial power to resolving actual "Cases" and "Controversies," not theoretical questions. U.S. Const. art. III, § 2. And one "telltale" of a case or controversy is that "the parties have standing to bring it." *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018). Although the term "standing" does not appear in Article III, our standing doctrine is "rooted in the traditional understanding of a case or controversy" and limits "the category of litigants empowered to maintain a lawsuit in federal court[.]" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The effect is to confine "the federal courts to a properly judicial role[.]" *Id.*

There are three elements to standing. The plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The plaintiff carries the burden of establishing those three elements, and at the pleading stage, the plaintiff must clearly allege facts demonstrating each element. *Id.* Moreover, the injury in fact must be both "(a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

Buchholz must first show that he has suffered an injury in fact, which itself includes two sub-elements, concreteness and particularization. *Id.* The parties do not dispute that Buchholz's injury is particularized, but as the Supreme Court has repeatedly underscored, particularization is not enough. *Spokeo*, 136 S. Ct. at 1548; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). The injury must also be concrete, and the parties dispute if the alleged injury here meets that criteria.

A concrete injury is, like it sounds, "real and not abstract." *Spokeo*, 136 S. Ct. at 1548 (punctuation and internal quotation marks omitted). But that does not mean all concrete injuries must be tangible economic or physical harms. *Spokeo* noted that "intangible injuries can nevertheless be concrete." *Id.* at 1549. Specifically, the Court cited cases that vindicate First Amendment values as examples in support. *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)); *see also* Rachel Bayefsky, *Psychological Harm and Constitutional Standing*, 81 Brook. L. Rev. 1555, 1557 (2016) ("The idea that certain intangible interests can count for Article III standing is by no means novel.").

On the other hand, courts have recognized that there are, as there must be, limits on what kinds of allegations of intangible harm satisfy Article III. The *Spokeo* Court held that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." 136 S. Ct. at 1549. In *Valley Forge Christian College v. Americans United for Separation of Church and State*, the Court held that the alleged "psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing under Art. III[.]" 454 U.S. 464, 485 (1982). And in *Humane Society of United States v. Babbitt*, the court held that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." 46 F.3d 93, 98 (D.C. Cir. 1995). *See also Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 619–20 (2007) (Scalia, J., concurring in the judgment) (Courts should reject the "conceptualizing of injury in fact in purely mental terms[.]"). And at least one commentator has noted that "the Supreme Court has not directly analyzed the cognizability of psychological harm as injury-in-fact." Bayefsky, *supra*, at 1557.

In addition, and relevant here, some concrete, intangible injuries may also flow from statutory violations. *Spokeo*, 136 S. Ct. at 1549. Indeed, Congress may "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before[.]" *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment). But again, there are restrictions. Though Congress may create new procedural rights

and provide plaintiffs with causes of action to vindicate those rights, separation-of-powers principles prevent Congress from expanding the scope of the judicial power beyond what Article III permits. *See Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 464–65 (6th Cir. 2019). Congress cannot confer standing on a plaintiff—and thus open the door to federal court—when the plaintiff has not sustained an injury in fact; Article III's standing requirements still apply. *Spokeo*, 136 S. Ct. at 1549. As the Court explained, "Congress'[s] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* A plaintiff cannot "for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.*

The facts in *Spokeo* highlight this principle. *Spokeo* involved the Fair Credit Reporting Act of 1970, 15 U.S.C. § 1681, *et seq.*, which requires consumer credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer credit reports. § 1681e(b). The statute provides consumers with a cause of action if a consumer reporting agency violates their statutorily created procedural rights. But as the Court noted, not all procedural violations rise to the level of an injury in fact:

> A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Spokeo*, 136 S. Ct. at 1550. So when a reporting agency issues a credit report that misstates the consumer's zip code, the plaintiff may have a statutory ticket to federal court because, in a hyper-literal sense, the agency failed to provide accurate information. But because the plaintiff has not sustained an injury in fact, Article III keeps the court's doors closed.[2]

---

[2]The Court in *Spokeo* did not hold that the plaintiffs lacked standing but instead remanded to the Ninth Circuit, instructing that court to determine whether the plaintiff sustained a concrete injury.

The Court acknowledged that *some violations* of procedural rights "can be sufficient in some circumstances to constitute [an] injury in fact." *Id.* at 1549. In those cases, the "risk of real harm" can satisfy Article III's concreteness requirement, and the plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.* The Court did not establish a bright-line rule for when a procedural violation, by itself, rises to the level of an injury in fact, and this court has since noted that "[i]t's difficult, we recognize, to identify the line between what Congress may, and may not, do in creating an 'injury in fact.'" *Hagy*, 882 F.3d at 623. But the Supreme Court explained that "both history and the judgment of Congress play important roles" in determining whether an intangible injury is concrete. *Spokeo*, 136 S. Ct. at 1549. Under that framework, on top of whether the alleged intangible harm has a "close relationship" to traditional harms, courts must consider whether Congress has "identif[ied] and elevat[ed]" an intangible harm. *Id.* "Congress[,]" the Court noted, "is well positioned to identify intangible harms that meet minimum Article III requirements[.]" *Id.*

*Spokeo* suggests that Buchholz has two ways of proving an injury in fact flowing from MNT's alleged violation of the FDCPA. First, Buchholz could allege that MNT violated the statute in a way that caused him concrete harm. Second, Buchholz could allege that MNT's violation of the statute did not cause tangible harm but created a risk of harm that Congress intended to prevent. Buchholz makes both arguments. First, Buchholz claims that the anxiety he felt from reading MNT's letters and from fearing litigation is a concrete injury in fact. And second, he argues that MNT's alleged FDCPA violation, by itself, amounts to an injury in fact, setting aside the anxiety he experienced.

*Anxiety as Injury in Fact*. It is far from clear that a bare allegation of anxiety is a concrete injury. Buchholz cites no case from this court holding that anxiety, on its own, is an injury in fact—and as best we can tell, no such case exists. Instead, Buchholz points us to non-binding authority holding that a plaintiff could recover damages for emotional distress under the FDCPA. As Buchholz notes, the Ninth Circuit held that a district court did not abuse its discretion in denying a motion for a new trial after a jury awarded damages for emotional distress in a FDCPA suit. *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011). There, a debt-collection law firm prosecuted a lawsuit against the plaintiff,

even though the firm knew that the lawsuit was time-barred. *Id.* at 947. After the jury awarded statutory and punitive damages, along with $250,000 for emotional distress, the defendants moved for a new trial and then appealed the district court's denial of that motion. *Id.* at 957. The Ninth Circuit affirmed that decision, explaining that the FDCPA "provides for the award of actual damages[,]" which could include damages for personal humiliation, embarrassment, mental anguish, and emotional distress. *Id.*

Within our circuit, several district courts have held the same. One court allowed the plaintiff to recover emotional-distress damages after a debt collector made repeated phone calls to collect a disputed debt, warned that the plaintiff had committed a felony by failing to pay the debt, and "stated she was outside the local county Sheriff's Office and [ ] about to walk in to get a warrant for [the] Plaintiff's arrest." *Smith v. Reliant Grp. Debt Mgmt. Sols.*, 2018 WL 3753976, at *3 (E.D. Mich. Aug. 8, 2018). Likewise, a different district court held that the plaintiff could recover damages for emotional distress where the debt collector threatened to seize the plaintiff's personal property and press criminal charges if the plaintiff did not pay in twenty-four hours. *Link v. Recovery Sols. Grp., L.L.C.*, 2018 WL 1980657, at *5 (E.D. Mich. Apr. 27, 2018).

Buchholz asks us to infer from those cases that anxiety, in the context of the FDCPA, is a cognizable injury. But those cases do not address the basis for the court's subject-matter jurisdiction. Thus, we cannot tell what the plaintiff's injury in fact was. As Buchholz knows well (and we discuss later), there are different ways to satisfy Article III's injury-in-fact requirement. Some procedural violations, by themselves, can amount to an injury in fact, even when the plaintiff has not suffered a tangible injury. *See Spokeo*, 136 S. Ct. at 1550. And that may well be what happened in those three cases, where the debt collector either knowingly litigated a time-barred claim or where the debt collector threatened the consumer with arrest and criminal prosecution unless the consumer paid promptly. Indeed, those violations alone may be cognizable injuries, setting aside whatever additional injuries the plaintiffs may have suffered. So we cannot infer from those three cases that the anxiety Buchholz has alleged is an injury in fact.

Moreover, in those cases, the emotional distresses were accompanied by corroborating allegations that established more than bare anxiety. This makes sense. *Spokeo* instructs us to look to traditional harms when assessing allegations of intangible harm. And in the context of psychological injuries, alleging "anxiety" alone appears to fall short of cognizable injury as a matter of general tort law. One source, for example, defines psychological injury as "the result of exposure to an incident that is mentally and emotionally traumatic because the incident presents a threat to the plaintiff's life: to health, to control over one's life, to peace of mind and enjoyment of life, or even the threat of death itself." 26 Am. Jur. Proof of Facts 3d 1 n.3 (1994). Similarly, under the *Restatement*:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises.

Restatement (Second) of Torts § 46 (1965).

To be fair, the Restatement (Third) of Torts: Physical and Emotional Harm § 45 (2012) broadly defines "emotional harm" to mean "impairment or injury to a person's emotional tranquility." And a comment notes that this harm "encompasses a variety of mental states, including . . . anxiety . . . ." *Id.* § 45 cmt. a. Nevertheless, that Restatement defines the possible liability for emotional harm narrowly to exclude mere anxiety: "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm." *Id.* § 46. So the conduct must be "extreme and outrageous" and the emotional harm must be "severe." In other words, "[a] great deal of conduct may cause emotional harm, but the requisite conduct for this claim—extreme and outrageous—describes a very small slice of human behavior. The requirement that the resulting harm be severe further limits claims." *Id.* § 46 cmt. a. Looking to traditional harms here does not help Buchholz.

Thus, Buchholz's failure to allege anything other than anxiety makes us skeptical about whether he has established an injury in fact.**[3]** In addition, we are reluctant to find that what the Supreme Court held in *Spokeo*—that an allegation of a "bare procedural violation" cannot satisfy Article III—can be undone by the simple addition of one word to a pleading.

Nevertheless, we need not decide whether a bare anxiety allegation, in the abstract, fails to satisfy the injury-in-fact requirement. Buchholz fails to establish his Article III standing for other reasons more specifically related to his complaint.

Indeed, Buchholz fails a different aspect of the injury-in-fact analysis. His problem is that his anxiety, as alleged, amounts to the fear of a future harm—an "injury" that is rarely cognizable. After Buchholz received MNT's letters, he allegedly "felt an undue sense of anxiety that he *would be* subjected to legal action if prompt payment [on his debts] was not made." (R. 12, First Am. Compl. ¶ 32 (emphasis added).) In other words, Buchholz was nervous about being sued at some point in the future.

But the Supreme Court has explained that the fear of a future harm is not an injury in fact unless the future harm is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). That case addressed a constitutional challenge to the Foreign Intelligence Surveillance Act of 1978, which authorizes government surveillance of certain foreigners located outside the United States. *Id.* at 401. The challengers, a group of attorneys and human rights advocates, alleged several injuries in fact, including their fear that the government would monitor their communications with foreign contacts. *Id.* at 410. But because it was far from certain that the government would intercept any of the challengers' communications, the Court described the challengers' alleged injury as a "highly speculative fear" that was not cognizable. *Id.* When a plaintiff claims to have standing based on the threat of a future injury, it is not enough that the future injury is reasonably likely to occur—the "threatened injury must be certainly impending." *Id.*

---

**[3]**We are mindful of the Supreme Court's admonition that we must keep the merits of his claim separate from the standing question. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998) (explaining the "fundamental distinction" between the merits and standing). Buchholz's failure to allege what would amount to a plausible merits claim of emotional distress at common law seems, perhaps, more suited to the former inquiry and not the latter.

Buchholz lacks standing under *Clapper* because the threat of litigation was not "certainly impending" when Buchholz filed his complaint.  MNT's letters do not threaten litigation, nor has Buchholz alleged that he received any other communications from MNT warning that a lawsuit was forthcoming.  And most importantly, Buchholz has not alleged that he refuses to pay what MNT says he owes.  Rather, he fears what might happen *if* he does not pay.  So far as we know, Buchholz might decide to pay his debts, warding off any prospect of litigation.  Because Buchholz has neither alleged that MNT has threatened to sue him nor that he refuses to pay his debts, we cannot infer that litigation is "certainly impending."

Finally, a plaintiff cannot create an injury by taking precautionary measures against a speculative fear.  The *Clapper* challengers offered another theory of standing, explaining that they had incurred "costly and burdensome measures to protect the confidentiality of sensitive communications."  *Id.* at 407 (internal quotation marks and citation omitted).  The Court rejected that basis for standing, too, underscoring that the harm the challengers sought to avoid was "not certainly impending."  *Id.* at 416.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.*  So Buchholz cannot claim—nor does he—that his meetings with his attorney amount to an injury in fact.  Thus, Buchholz's allegation of anxiety falls short of the injury-in-fact requirement because it amounts to an allegation of fear of something that may or may not occur in the future.

Next, even if Buchholz's anxiety allegation could satisfy the injury-in-fact requirement, Buchholz must still satisfy the two remaining standing prerequisites:  traceability and redressability.  On this front, Buchholz comes up short again.  MNT argues that Buchholz's sense of anxiety is "nothing other than the anxiety he would feel in facing debt collection," not because of anything specific to the letters.  (Appellee Br. at 27.)  In other words, Buchholz is anxious about the consequences of his decision to not pay the debts that he does not dispute he owes.

Buchholz's alleged injury looks like a self-inflicted injury, in which case he lacks standing to sue MNT.  The D.C. Circuit, for example, has repeatedly stated that self-inflicted injuries are not even injuries in fact.  *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,

489 F.3d 1279, 1290 (D.C. Cir. 2007) (Kavanaugh, J.); *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006); *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994). But the real point is that a self-inflicted injury fails the second standing prerequisite, traceability. The plaintiff must show "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *see also Warth v. Seldin*, 422 U.S. 490, 505 (1975) (To satisfy Article III, plaintiff must show "the asserted injury was the consequence of the defendants' actions[.]"). But if the plaintiff caused his own injury, he cannot draw a connection between that injury and the defendant's challenged conduct. A self-inflicted injury, by definition, is not traceable to anyone but the plaintiff.

This court has not addressed when an injury is self-inflicted, but other courts and treatises offer guidance. The standard for establishing traceability for standing purposes is *less demanding* than the standard for proving tort causation. *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990). At the pleading stage, the plaintiff's burden of "alleging that their injury is 'fairly traceable'" to the defendant's challenged conduct is "relatively modest[.]" *Bennett v. Spear*, 520 U.S. 154, 171 (1997). Thus, harms that flow "indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Still, there are cases when a plaintiff will fail to meet the traceability standard, such as when an injury is "so completely due to the [plaintiff's] own fault as to break the causal chain." *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3531.5, at 458 (2d ed. 1984)). To give an example, the D.C. Circuit held that two plaintiffs could not obtain injunctive relief against their former employer because their injury was self-inflicted. *Taylor v. F.D.I.C.*, 132 F.3d 753, 759 (D.C. Cir. 1997). In that case, an employer reassigned the plaintiffs to a less desirable division after the plaintiffs expressed concerns about an internal reorganization. *Id.* The employees ultimately resigned and then sued, requesting reassignment to the positions they held before

criticizing the reorganization.  *Id.* at 766.  The D.C. Circuit noted that although the plaintiffs may have only formally requested *reassignment* to their old jobs, they effectively sought *reinstatement* to the company on top of reassignment.  But because the plaintiffs departed the company voluntarily, they had "create[d] a large hole in their cause of action:  In requesting reinstatement, they seek a remedy for injury that is in large part self-inflicted."  *Id.* at 767.

For his first alleged injury in fact, Buchholz does not dispute that he owed the debts, nor does he allege that MNT's letters contained any inaccuracies.  To be sure, MNT's letters made clear that Buchholz's creditors had not forgotten about him.  But the anxiety Buchholz alleges is not because of anything MNT wrote.  He alleges an "undue sense of anxiety that he would be subjected to legal action *if* prompt payment was not made" on his debts.  (R. 12, First Am. Compl. at ¶ 32 (emphasis added).)  The cause of that anxiety falls squarely on Buchholz because *he* chose not to pay his debts—and now fears the consequences of his delinquency.  So even if anxiety is a cognizable injury—and we have our doubts—the anxiety that Buchholz alleges is not traceable to anyone but him.  For these reasons, Buchholz cannot establish standing based on his allegations of anxiety.[4]

*Procedural Violation as Injury in Fact*.  Buchholz has one other possible injury in fact:  MNT's alleged FDCPA violation.  Buchholz claims that MNT violated the FDCPA's prohibition of the "false representation or implication that any individual is an attorney or that any communication is from an attorney" when it sent two letters suggesting that an attorney had formed a professional legal opinion that he owed the two debts.  15 U.S.C. § 1692e(3).  And Buchholz argues that this violation, by itself, is an injury in fact.

Congress may create procedural rights and provide parties with a cause of action to vindicate their rights.  It did so with the FDCPA, which allows consumers to sue "any debt collector who fails to comply with any provision [of the FDCPA.]"  15 U.S.C. § 1692k(a).  But just because a plaintiff alleges a procedural violation does not mean the plaintiff has constitutional standing.  *Spokeo*, 136 S. Ct. at 1549.  No matter what Congress provides by

---

[4]This also stands in direct contrast with the emotional distress that plaintiffs have recovered for in other cases because that distress is directly traceable to the defendants' debt-collecting conduct.

statute, the plaintiff must still satisfy Article III's standing prerequisites, including the injury-in-fact requirement. *Id.*

*Spokeo* makes this principle clear. The relevant statute in *Spokeo*—the Fair Credit Reporting Act—regulates creating consumer credit reports and requires credit reporting agencies to engage in "fair and accurate credit reporting." 15 U.S.C. § 1681(a)(1). And like the FDCPA, that statute provides consumers with a cause of action to sue any party that "willfully fails to comply with any requirement" of the Act. 15 U.S.C. § 1681n(a). But not all violations of the Fair Credit Reporting Act are injuries in fact. *See, e.g.*, *Spokeo*, 136 S. Ct. at 1550 ("It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm."). A bare procedural violation, "divorced from any concrete harm," cannot satisfy Article III's injury-in-fact requirement, even if the plaintiff has a statutory basis for litigating the claim in federal court. *Id*. at 1549.

The upshot of *Spokeo* is that not *all* procedural violations open the door to federal court. But *some* do, even when the procedural violation causes only an intangible injury. *Id*. Congress may choose to "identify[] and elevat[e]" certain intangible, concrete harms by statute. *Id.* That is not to say that Congress can, by statute, declare an injury concrete when the injury is, in fact, abstract and non-cognizable. But Congress may provide procedural rights that protect concrete interests, along with causes of action that allow plaintiffs to vindicate their rights. So if the plaintiff alleges a violation of a procedural right that protects a concrete interest, the plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.*

*Spokeo* tells us to consider two factors to determine whether an intangible injury is cognizable. First, we consider congressional judgment. *Id.* Because Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," its decision to create certain procedural rights and causes of action is "instructive and important." *Id.* So we look to "whether Congress conferred the procedural right in order to protect an individual's concrete interests." *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 754 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016)).

Although Congress's judgment may be informative, *Spokeo* explains, it is not determinative. That brings us to the second factor, the common law. An intangible harm that is analogous to a harm recognized at common law signals that the harm is cognizable. To that end, we consider traditional harms under English and American law. *Spokeo*, 136 S. Ct. at 1549.

Three recent, post-*Spokeo* decisions—two from this court, the other from the Eighth Circuit—help further clarify when an FDCPA violation creates an injury in fact. In *Hagy*, we held that the plaintiffs lacked standing because they suffered no harm—tangible or intangible—from the alleged procedural violation. 882 F.3d at 618. Having defaulted on a loan, the plaintiffs in *Hagy* contacted their creditor to try to work out a payment agreement, and they succeeded: the creditor's attorney wrote the plaintiffs' attorney to say that the plaintiffs were no longer responsible for the remaining balance on the loan. *Id.* at 618–19. But under the FDCPA, debt collectors must identify themselves as such when communicating with consumers, and the creditor's attorney failed to do so in his correspondence with the plaintiffs' attorney. *Id.* (discussing 15 U.S.C. § 1692e(11)). So even though the creditor's attorney relieved them of their obligation to pay, the plaintiffs sued the attorney for violating the FDCPA.

We held that the plaintiffs lacked standing because they did not (and could not) allege any harm from the creditor's procedural violation. *Id.* at 623. The creditor's attorney delivered good news, essentially eliminating the plaintiffs' debt, so no harm could have come from that communication. That is not to say that a violation of § 1692e(11) can never cause an injury in fact, just that it does not *necessarily* create a cognizable injury. Whether a procedural violation is cognizable depends on the particular circumstances of the case. And based on the record in *Hagy*, we could not see "how the [creditor attorney's] letter did anything other than help the [plaintiffs]." *Id.* at 622.

*Macy*, another FDCPA case published several months after *Hagy*, falls on the other end of the spectrum: the *Macy* plaintiffs alleged a procedural violation that turned out to be an injury in fact. 897 F.3d at 761. Those plaintiffs received a debt-collection letter explaining that they could dispute their debt within 30 days—and that if they did so, the debt collector would provide them with verification of the debt's validity. *Id.* at 751. But the debt collector neglected to inform the plaintiffs that it was legally obligated to provide that verification *only* if the plaintiffs

contested the debt *in writing*. *Id.*[5]  The plaintiffs sued, and the defendants challenged the court's subject-matter jurisdiction, arguing that the plaintiffs had not suffered an injury in fact. We rejected that challenge and held that the plaintiffs had standing because the debt collectors' misstatement could have led the plaintiffs to contest the debt orally and waive some of the FDCPA's other protections of their concrete interests. *Id.* at 758.  For example, if the plaintiffs had disputed their debts orally and requested verification of the debt's validity, the debt collector could have continued to demand payment from the plaintiffs without first providing evidence that the debt was, in fact, valid. *Id.*  In short, the defendant's letter placed the plaintiffs "at a materially greater risk of falling victim to 'abusive debt collection practices.'"  *Id.* (quoting 15 U.S.C. § 1692(e)).

Finally, the Eighth Circuit held that an alleged FDCPA violation was an injury in fact because the plaintiff alleged a harm that Congress intended to prevent and that bears a close relationship to harms recognized at common law. *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685 (8th Cir. 2017).  The dispute in *Demarais* began in state court, where a debt-collection firm filed a complaint to collect a consumer debt. *Id.* at 689.  The consumer did not answer the complaint, but rather than file a default judgment, the debt-collection firm asked the court to set the case for trial, thinking that the consumer would not appear.[6]  On the date of trial, however, the consumer appeared with an attorney, ready to litigate.  The debt-collection firm, on the other hand, had not prepared, assuming that the consumer would not show.  Caught flatfooted, the debt-collection firm ultimately moved to dismiss the complaint with prejudice. *Id.* at 690.  But several weeks later, the debt-collection firm sent the consumer a letter demanding payment on the debt, along with interrogatories and requests for admission, and told the consumer to respond in 30 days. *Id.*

---

[5]Under 15 U.S.C. § 1692g(a)(4), the debt collector must notify the consumer of its obligation to obtain verification of the debt and mail that verification to the consumer if the consumer disputes the debt *in writing*.  And under 15 U.S.C. § 1692g(a)(5), the debt collector must provide the consumer with the name and address of the original creditor—again only if the consumer disputes the debt *in writing*.

[6]The plaintiff alleged that under Minnesota law, obtaining a judgment for non-appearance at trial is easier than obtaining a default judgment on a consumer debt when the consumer fails to answer a complaint. *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 689 (8th Cir. 2017)

After receiving that letter, the consumer sued the debt-collection firm in federal court, alleging that the firm violated the FDCPA by trying to collect a debt not "permitted by law." *See* 15 U.S.C. § 1692f(1). The debt-collection firm argued that the plaintiff, who had alleged only intangible injuries, had not shown a concrete injury in fact, so the court considered *Spokeo*'s two factors. On the first factor, congressional judgment, the court noted that Congress had "identified a harm—being subjected to attempts to collect debts not owed[,]" and that Congress created a procedural right to "be free from attempts to collect debts not owed, helping to guard against identified harms." *Demarais*, 869 F.3d at 691–92. And on the common law, the court explained that the harm Congress identified—being asked to pay a debt not owed—resembles "the harm suffered by victims of the common-law torts of malicious prosecution, wrongful use of civil proceedings, and abuse of process." *Id.* at 691. Having alleged a harm that Congress intended to prevent—and that resembled a harm recognized at common law—the plaintiff satisfied Article III's injury-in-fact requirement. *Id.* at 692.

Buchholz claims that MNT's alleged procedural violation caused a concrete—though intangible—injury. So we consider the two factors from *Spokeo*, congressional judgment and the common law, to determine whether the procedural violation is cognizable. Buchholz argues—and we do not disagree—that Congress passed the FDCPA to prevent debt collectors from engaging in abusive debt-collection practices. But even assuming MNT violated the statute by misrepresenting that an attorney had reviewed Buchholz's debts, we find ourselves, like we were in *Hagy*, unable to identify any harm to come from that violation. Buchholz gives us no reason to believe he did not owe the debts. He does not allege, for example, that the statute of limitations has expired, that res judicata precludes MNT from collecting the debts, or even that MNT miscalculated the amounts he allegedly owes. Nor does he allege, like the plaintiffs in *Macy*, any omissions or misstatements in the letters that could have caused him to waive some of his procedural rights under the FDCPA. The letters simply informed Buchholz of the two debts and contained boilerplate language—required under the FDCPA—about how to pay or challenge the debts. And to be sure, Buchholz has not alleged that MNT threatened him with arrest or criminal prosecution, as the debt collectors did in *Smith* and *Link*. We are at a loss for how MNT's letters caused any harm, much less harm that Congress intended to prevent when it enacted the FDCPA.

As to the second *Spokeo* factor, the common law, Buchholz comes up short again. Buchholz makes no argument that the injury he suffered is like a harm that the common law recognizes. Nor could he. MNT's letters do not even mention litigation, so any comparison to abuse of process would be inapt. Malicious prosecution does not fit, either, because Buchholz has not alleged that MNT ever threatened him with arrest, criminal prosecution, or civil litigation. Nor does intentional infliction of emotional distress, as we discuss above, which requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, cmt. d (1965). MNT's letters cannot possibly rise to that level. Buchholz's failure to identify an analogous harm and corresponding common law cause of action—and our inability to identify one on his behalf—is another signal that his alleged harm is not cognizable.

Because Buchholz has not shown that he suffered a harm Congress intended to prevent or that is analogous to a harm that the common law recognizes, he cannot prevail on the theory that MNT's procedural violation, by itself, is an injury in fact.

III.

Buchholz has failed to allege a concrete injury in fact fairly traceable to MNT's challenged conduct. Thus, he lacks standing to bring this claim, and we lack subject-matter jurisdiction to consider it. For that reason, we decline to address MNT's alternative argument that Buchholz has failed to state a claim. We AFFIRM.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

MURPHY, Circuit Judge, concurring in part and concurring in the judgment. The court offers a thoughtful discussion of difficult standing questions, and I concur in a part of its opinion. The court rightly holds that, under current pleading rules, Gustav Buchholz did not plausibly allege that his anxiety was caused by the (purportedly) illegal conduct of Meyer Njus Tanick, PA. And the court rightly holds that, under current Supreme Court precedent, a violation of the Fair Debt Collection Practices Act does not automatically create standing. I cannot, however, join in the parts of the opinion that express doubt over whether mental anxiety can create a "Case" or "Controversy" under Article III of the Constitution. I therefore concur in the judgment, as I believe that mental harm can produce an Article III case. I write to briefly explain my thinking.

I begin with the basics. Article III grants only the "judicial Power" to federal courts and permits those courts to exercise this power only in "Cases" or "Controversies." U.S. Const. art. III, §§ 1–2. These words place real limits on the judicial branch's power to intervene in people's lives through the resolution of (often weighty) legal issues. *Cf. In re 2016 Primary Election*, 836 F.3d 584, 587–88 (6th Cir. 2016). That has been true since the founding. When President Washington asked the Supreme Court for a legal opinion apart from a pending "case," the Justices replied that the "lines of separation drawn by the Constitution between the three" branches of government prevented them from giving that sort of advice. 3 Henry P. Johnston, *The Correspondence and Public Papers of John Jay* 488 (1891); *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1565 & n.3, at 420 (1833). The rule against "advisory opinions" has been in place ever since. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *United States v. Fruehauf*, 365 U.S. 146, 157 (1961); *United States v. Evans*, 213 U.S. 297, 300–01 (1909).

With this judicial limit secure, the Supreme Court next needed "to distinguish requests for advisory opinions" that courts must decline from the "true 'Cases' and 'Controversies'" that they may entertain. Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing*

*Doctrine?*, 102 Mich. L. Rev. 689, 722 (2016).  The Court has defined these terms with an eye toward history, holding that they refer to disputes "of the sort traditionally amenable to, and resolved by, the judicial process."  *Steel Co.*, 523 U.S. at 102 (citing *Muskrat v. United States*, 219 U.S. 346, 356–57 (1911)).  In other words, the judicial power "come[s] into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.'"  *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000) (quoting *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (Frankfurter, J., concurring)).

The concept that now goes by "standing" (but that existed well before that label) is one of the "doctrine[s] rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see* Woolhandler & Nelson, *supra*, at 691.  The Supreme Court's cases have gradually molded this doctrine into the test we know today: To sue, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 136 S. Ct. at 1547.  Its cases have further developed the test's injury element to require the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

When applying this modern test, though, the Court has not lost sight of evidence about what has historically made out a "case."  *E.g.*, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274–85 (2008); *Vt. Agency*, 529 U.S. at 773–78.  Take the injury-in-fact element.  The Court has not considered whether an asserted injury qualifies as "concrete" using judicial intuition alone.  It has instead considered whether the injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo*, 136 S. Ct. at 1549.  That makes good sense.  An "accepted tradition" that courts can redress a certain type of injury should "not to be laid on the examining table and scrutinized for its conformity to" the concrete-injury element more recently devised by the Court.  *See Rita v. United States*, 551 U.S. 338, 379 (2007) (Scalia, J., concurring in part and concurring in the judgment) (citation omitted).  No, "such traditions are themselves the stuff out of which" the meaning of that element should be formed.  *See id.* (citation omitted).  Here, as elsewhere, "[a]ny

test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014); *see Burnham v. Super. Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality op.).

How does this analysis play out for mental distress? In my view, it depends on the nature of the actions that cause the distress. Compare two examples. In the first, the government agrees to transfer its property to a religious college. Bystanders to this transfer sue to stop it, claiming as their injury the distress caused from knowing that their government is violating the Establishment Clause. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). In the second, a group pickets outside the funeral of a soldier killed in Afghanistan using odious language like "Thank God for Dead Soldiers." The soldier's father sues the group for the intentional infliction of emotional distress, claiming as his injury the distress caused by their conduct. *See Snyder v. Phelps*, 562 U.S. 443, 448–50 (2011). I tend to think that the former allegations do not suffice whereas the latter allegations likely do. Why? When it comes to whether mental harms can establish an Article III case, I read Supreme Court precedent as resembling Justice Thomas's recent proposal to distinguish between an alleged violation of a public right (like the first example) and an alleged violation of a private right (like the second example). *Spokeo*, 136 S. Ct. at 1550–53 (Thomas, J., concurring). That precedent suggests that mental harms arising from the violation of only personal rights create Article III cases.

Start with the public-rights example. *See Valley Forge*, 454 U.S. at 485. The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (citation omitted); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 225–26 (1974); *Ex parte Levitt*, 302 U.S. 633, 635–36 (1937) (per curiam); *Fairchild v. Hughes*, 258 U.S. 126, 129–30 (1922); *cf. Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 426 (6th Cir. 2019) (Rogers, J., concurring). Even when

the government's alleged violation of a law produces mental distress in the party who seeks to challenge it, that sort of "psychological" trauma alone "is not an injury sufficient to confer standing under Art. III." *Valley Forge*, 454 U.S. at 485.  So the Supreme Court has dismissed suits challenging government conduct when parties not directly affected by that conduct have asserted mental harms like the stigma from racial discrimination, *Allen v. Wright*, 468 U.S. 737, 755 (1984), or the discomfort from knowing that a species may go extinct, *Lujan*, 504 U.S. at 562–64; *see ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989) (plurality op.).  (The offense for those who come across public monuments with a religious cast may or may not fall within this category too.  *See Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2098–100 (2019) (Gorsuch, J., concurring in the judgment).)

Turn to the private-rights example.  *See Snyder*, 562 U.S. at 448.  The Supreme Court has recognized that an "intangible harm" can qualify as an Article III injury.  *See Spokeo*, 136 S. Ct. at 1549; *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972).  If a plaintiff's claim is sufficiently particularized (or, in Justice Thomas's view, if the plaintiff asserts the violation of a private right), I tend to think that mental distress satisfies any additional concreteness requirement. I reach that conclusion for a simple reason: It comports with a long tradition of allowing plaintiffs to sue for mental-distress damages.  *Cf. Vt. Agency*, 529 U.S. at 773–78.  "Distress," including "mental suffering or emotional anguish," "is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff."  *Carey v. Piphus*, 435 U.S. 247, 263–64 & n.20 (1978).  Recovery for that type of injury has been part of our common-law tradition for centuries.  *See, e.g.*, Joseph Henry Beale, *Collection of Cases on the Measure of Damages* 337–63 (1895) (collecting cases); *see also* Arthur G. Sedgwick, *Elements of Damages: A Handbook for the Use of Students and Practitioners* 98–105 (1896).  "In a variety of actions founded on personal torts, and in many where no positive bodily harm has been inflicted, the plaintiff is permitted to recover for injury to the feelings and affections, for mental anxiety, personal insult, and that wounded sensibility which follows the invasion of a large class of personal rights."  *Ballou v. Farnum*, 93 Mass. 73, 77 (1865).

I concede that the common law typically authorized "no recovery" if a plaintiff incurred *only* "mental suffering." *S. Express Co. v. Byers*, 240 U.S. 612, 615 (1916) (citing 1 Thomas Cooley, *A Treatise on the Law of Torts* 94 (3d ed. 1906)); *see* Restatement (First) of Torts § 46. Instead, mental-distress damages were usually "'parasitic'" in the sense that a plaintiff could recover for those injuries only if the plaintiff asserted "the violation of some other recognized legal right." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1048 (1936) (citation omitted); Restatement (First) of Torts § 47(b). But that limitation does not alter my thinking. For starters, it came with exceptions. Consider the common-law tort of assault. "Since the ancient case of the tavern keeper's wife who successfully dodged the hatchet cast at her by an irate customer," courts have allowed recoveries for mental anxiety alone when caused by an attempted battery. Magruder, *supra*, at 1033–34, 1050 (discussing *De S. & Wife v. W. de S.*, (1348 or 1349) Y.B. 22 Edw. 3, f. 99, pl. 60); *see* 3 William Blackstone, *Commentaries on the Laws of England* \*120; Restatement (First) of Torts § 24 cmt. c; *id.* § 905 cmt. e. Besides, this common-law rule addressed the scope of the substantive tort law; it did not treat mental suffering as a non-existent harm. As one case noted, the rule meant only that "the act complained of was not an infraction of any legal right, and hence not an actionable wrong at all"; it did not mean that "mental suffering, as a distinct element of damage, is never a proper subject of compensation." *Larson v. Chase*, 50 N.W. 238, 239 (Minn. 1891); *see* Sedgwick, *supra*, at 103–04.

And, as *Lujan* teaches, legislatures may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 504 U.S. at 578. State common-law courts have already made that elevation in this context—as evidenced by the modern torts allowing recovery for the intentional or negligent infliction of emotional distress. *See, e.g.*, *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544–50 (1994); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53 (1988); *see generally* William L. Prosser, *Insult and Outrage*, 44 Cal. L. Rev. 40 (1956). Congress, when acting within the bounds of its Article I powers, can elevate this kind of concrete and particularized mental injury too. It, for example, may permit a debtor to sue for the distress caused by a debt collector's threatened violence if the debtor doesn't pay up, even if the debtor had no federal right to recover for that distress before 1977. (That said, whether the Fair Debt Collection Practices Act's "actual damages" language, in fact, covers

mental distress is not before us.  15 U.S.C. § 1692k(a)(1); *cf. FAA v. Cooper*, 566 U.S. 284 (2012).)

To be sure, courts may sometimes face difficulty distinguishing between an Article III case (in which an individual has sued for the mental distress caused by the violation of a private right) and a nonjusticiable request for an advisory opinion (in which an individual has sued for the mental distress caused by the violation of a public right).  *See* William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 230–31.  In a different context, for example, the Supreme Court has "not been entirely consistent" when differentiating the core private rights that must be adjudicated in Article III courts from the "public rights" that may be adjudicated outside them.  *Stern v. Marshall*, 564 U.S. 462, 488 (2011).  The principles that the Court currently applies in that context may not map on neatly in this one.  Yet current standing law already requires courts to draw something like this distinction between private and public rights with its requirement that an injury be "particularized" and "affect the plaintiff in a personal and individual way."  *Spokeo*, 136 S. Ct. at 1548 (citation omitted).  This "historically recognized" distinction might help give content to the particularity element in difficult cases.  Woolhandler & Nelson, *supra*, at 693.

In the end, this analysis leads me to decline to join the court's suggestion that anxiety alone may not be a concrete Article III injury.  But, as the court goes on to explain, Buchholz's allegations against the two letters sent by Meyer Njus Tanick collapse under a combination of standing's traceability element and the Supreme Court's pleading standards.  Buchholz alleges that he felt anxiety from the letters' purportedly false (and entirely implied) representation that a lawyer had meaningfully reviewed his debt.  Even if Buchholz could recover for mental anxiety, he has failed to plead enough allegations suggesting that this implied representation—as opposed to the fact that he had received a letter from a lawyer about a valid debt—caused any distress. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013).  In addition, the court rightly adds that Buchholz may not fall back on the mere invasion of a right provided by the Fair Debt Collection Practices Act.  The Supreme Court has rejected the view that "the violation of a statutory right automatically satisfies the injury-in-fact requirement whenever a statute authorizes a person to sue to vindicate that right."  *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (per

curiam); *see Hagy v. Demers & Adams*, 882 F.3d 616, 621–23 (6th Cir. 2018). That leaves Buchholz with no injury on which to rest his claim, so the district court properly dismissed it for lack of standing.